# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-02494 (JLK)


Rinaldo Yarrito,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Rinaldo Yarrito,


Carlos Perez
Detainee,

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Carlos Perez,


Maria E. Fragu
Detainee,

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Maria E. Fragu,


José Chavez
Detainee,

United Food & Commercial Workers Union, Local No. 7
As Next Friend of José Chavez,


Adam M. Flores
Detainee,

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Adam M. Flores,

Rinald Dirrato,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Rinald Dirrato,


Arrestada Joy Aspose,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Arrestada Joy Aspose,


Kimberly Cordova,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Kimberly Cordova,


Roberto Burgos Roman,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Roberto Burgos Roman,


Rudy Hernadez,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Rudy Hernadez,


Lionel Vicente Chum
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Lionel Vicente Chum,

Juan Vela,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Juan Vela,


Marquerez Barron,
Detainee

United Food & Commercial Workers Union, Local No. 7
As Next Friend of Marquerez Barron,


And all other persons similarly situated,

       v.

Julie L. Meyers,
Assistant Secretary for Homeland Security

And

U.S. Immigration and Customs Enforcement Division of the Department of
Homeland Security.

_____

# BRIEF IN SUPPORT OF
# PETITION FOR WRIT OF HABEAS CORPUS
_____

Petitioners, Rinaldo Yarrito, Carlos Perez, Maria E. Fragu, José Chavez,

Adam M. Flores, Rinald Dirrato, Arrestada Joy Aspose, Kimberly Cordova,

Roberto Burgos Roman, Rudy Hernadez, Lionel Vicente Chum, Juan Vela,

and Marquerez Barron, and others similarly situated and their Next Friend,

United Food and Commercial Workers Local No. 7, by and through

undersigned counsel, submit this Brief in support of its Petition for Writ of Habeas Corpus. In support thereof, it sets forth the following:

## INTRODUCTION

This action challenges the seizure and current detention of Petitioners. On December 12, 2006, Petitioners were arrested during a raid on their place of employment, the Swift Company meat packing plant in Greeley, Colorado ("Swift"), by agents employed by the Immigration and Customs Enforcement division ("ICE") of the U.S. Department of Homeland Security. Petitioners have remained in the custody of ICE since that date. Many of the petitioners have been denied right to counsel along with no contact or communication with their families or employer. While ICE has supplied a list of persons taken into custody during the December 12 raid (Exhibit 1), it is impossible to verify the accuracy of this list.

## FACTUAL BACKGROUND

On December 12, 2006, at a time prior to 7:30 a.m., ICE agents stormed the Swift plant in Greeley, Colorado.[1] According to statements made on its behalf in the media, the raid was conducted pursuant to a criminal investigation into identity theft. ICE surrounded the plant and posted agents at each entrance/exit point, including the employee parking lot and security sign-in desk.

---

[1] /     The exact number of agents is indeterminate.  However, it is believed to exceed one hundred.

Inside, more agents roamed the plant. Eventually, they rounded up each employee and ordered them to the break room/cafeteria.

The Swift plant has a collective bargaining agreement with the United Food and Commercial Workers Local 7 ("UFCW"). (Exhibit 2) UFCW union officials visit the plant to ensure contract compliance on a daily basis.

Joanne Lopez is a UFCW union representative for the Swift plant. Ms. Lopez is of Hispanic descent.

Ms. Lopez arrived at the plant at approximately 7:45 a.m. After identifying herself to ICE agents at both the parking lot and security sign-in desk, she was allowed into the plant.

Persons who are going to be on the production floor must wear protective clothing. There is an office inside the plant where UFCW union representatives may change into the protective clothing. ICE agents confronted Ms. Lopez at this office. Before she could get fully changed, they ordered her into the break room/cafeteria.

After several minutes in the break room/cafeteria, an ICE agent shouted to quiet the crowd and said the following: "Listen up! If you are a US citizen, go to one side [of the breakroom/cafeteria]." He directed them to the area he wanted them to go.

Once the room was split, ICE agents asked each person in the area designated for US citizens whether they were, indeed, US citizens. If answered affirmatively, ICE agents asked them to identify where they were

born. Afterwards, these individuals were moved to the training room, a smaller area on another floor. There, ICE agents asked more questions. ICE agents asked, among other things, from where did the individuals obtain their identifications

After ICE agents completed questioning Ms. Lopez in the training room, she demanded that ICE allow her to speak with other employees, as she was their union representative. ICE denied the demand. They told Ms. Lopez the reason for the denial was that it was conducting a federal criminal investigation.

During this time, ICE denied numerous requests to go to the bathroom, to make telephone calls, or to get something to eat.

Finally, at 12:30, the ICE agents allowed the Petitioners to eat lunch. During lunch, several employees told Ms. Lopez they were mistreated by ICE agents.

At the completion of the raid, ICE agents removed Petitioners from the Swift plant. Each individual is of Hispanic descent. ICE provided no information to Petitioners' employer, their families, UFCW, or any other non-ICE individual or entity about to where ICE was taking Petitioners.

UFCW immediately retained attorneys to represent Swift employees. These attorneys have sought to determine where Petitioners are being held by contacting an ICE facility in Aurora, Colorado, the Denver office of the Immigration and Customs Enforcement division, and the Denver offices of

the U.S. Citizenship and Immigration Services. Moreover, UFCW was not been notified of the place of petitioners' incarceration. UFCW made numerous inquiries at their place of employment to no avail.

During the course of this endeavor, ICE officials informed the immigration attorneys that many of employees seized from the raid had signed voluntary departure agreements. Those individuals were being removed to outside of the United States.

Many of Petitioners' families have no knowledge of their current whereabouts. For the individuals presumed to have been removed from the U.S. by ICE, no contact was made with the immigration attorneys prior to their removal. It is unknown whether the detainees consulted with any counsel prior to their removal. No information has been provided about their whereabouts if they were removed from the U.S.

It is believed that approximately 260 individuals have been detained by ICE from the December 12, 2006 raid. The undersigned believe that less than five charges have been filed pursuant to ICE's criminal investigation into identity theft. None of these charges allege violations of federal crimes.

## DISCUSSION

### *Jurisdiction*

This Court has jurisdiction pursuant to 28 U.S.C. § 2241 and 2242 as well as 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; as well as the Fifth and Fourteenth Amendments to the United States Constitution to grant this

Writ of Habeas Corpus. Specifically, § 2241 (c)(1) provides the Court authority to grant the Writ if an individual is in federal custody under or by color of authority of the United States. As ICE is a federal agency and used its authority granted it by an Act of Congress to arrest Petitioners, said authority is granted this Court.

Further, this Court has jurisdiction to grant the Writ for any of Petitioners who were removed to outside of the U.S. ICE has retained control of Petitioners' movements and has restricted it since the December 12, 2006 seizure. Although the Government may argue that many of the Petitioners "voluntarily" departed the U.S., it is unknown how voluntary such a departure was given the lack of legal counsel to advise them of their rights. The Next Friend of Petitioners is uncertain if these voluntary departures even took place as no verification of such has been provided. Regardless, at all points during their encounter with ICE, Petitioners no longer had control over their movements within the U.S.; ICE had it.

There has been public affirmation of ICE's more aggressive approach to cases involving individuals suspected of being the United States in violation of immigration legal requirements. On October 18, 2005, Homeland Security Secretary Michael Chertoff made a statement to the U.S. Senate Judiciary Committee where he spoke of an "end to the 'old catch and release' style … [and for] increased removals." (Exhibit 3, p. 1) He went on to say, "We must end 'catch and release' and implement 'catch and return.'

In fact we are already taking steps to implement 'catch and return' as I speak." (*Id.*, p. 5). He ended that testimony by pledging DHS would, among other things, end the policy of catch and release, and implement more robust interior enforcement. (*Id.*, p. 7).

Secretary Chertoff's words evince an ICE policy that strengthens control over the movement of persons in the posture of Petitioners. Such control constitutes custody for habeas purposes, especially in light of the opportunity to challenge their deportability as required by law.

For these reasons, the Court has jurisdiction to grant the Writ whether Petitioners remain in or outside of the United States.

## *I.*

## *STANDING*

As noted in the original pleadings, agents for Immigration and Customs Enforcement (ICE) took more than two hundred persons into custody following a raid on December 12, 2006. Those taken by ICE are identified as the "detainees." United Food & Commercial Workers Union, Local No. 7, (hereinafter, "the Union") brings this action as the "Next Friend" of petitioners. Both detainees and UFCW as Next Friend have a right to petition for the Great Writ.

A.    The Detainees have standing.

The Government acknowledges that it has taken individuals into custody. The following statement is taken from the website of Immigration

and Customs Enforcement dated December 13, 2006.

> WASHINGTON, D.C. – Homeland Security Secretary Michael Chertoff, Assistant Secretary for Immigration and Customs Enforcement (ICE) Julie L. Myers, . . .today announced that approximately 1,282 persons have been arrested as part of an ongoing worksite enforcement investigation into immigration violations and a massive identity theft scheme that has victimized large numbers of U.S. citizens and lawful U.S. residents.

> Yesterday, ICE agents executed civil search warrants at six facilities owned by Swift & Company (Swift), one of the nation's largest processors of fresh pork and beef. Agents executed warrants at Swift facilities in *Greeley, Colorado*; Grand Island, Nebraska; Cactus, Texas; Hyrum, Utah; Marshalltown, Iowa; and Worthington, Minnesota.

> In total, *agents apprehended 1,282 illegal alien workers* on administrative immigration violations at Swift facilities. Of these, 65 have also been charged with criminal violations related to identity theft or other violations, such as re-entry after deportation. Countries of origin of those arrested were: Mexico, Guatemala, Honduras, El Salvador, Peru, Laos, Sudan and Ethiopia; others have yet to be identified. The investigation is ongoing. (See attached Exhibit 7 [Emphasis added])

Although ICE has now provided a list of those detained, the Next Friend is still in the process of identifying the individuals named and ensuring that they have had an opportunity to meet with counsel. Further, despite continuing efforts of the Next Friend, it is still not possible to determine whether all of those detained were properly and in a non-coercive manner advised of their rights to consult with counsel.

The Next Friend alleges a violation of the Fifth and Fourteenth Amendments. Clearly such an allegation is sufficient to give standing to the detainees to challenge the actions of ICE as a matter of law.  Detainees'

allegations establish a "likelihood" of injury that rises above the level of "unadorned speculation."   See *Pennell v. City of San Jose,* 485 U.S. 1, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988) (quoting *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). Despite the allegations that the detainees are in this country without proper authorization, these workers remain entitled to a determination cleansed of illegalities. "[T]he right to procedural due process * * * does not depend upon the merits of a claimant's substantive assertions."   *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978). To require for standing that a plaintiff show he would prevail if accorded appropriate process would cut off redress of due process violations in a host of cases. Regardless of the merits of their presence in the United States, union members and other workers may be entitled to sue for compensatory damages (at a minimum, nominal damages) if the government processed their detention illegally. Outcome is irrelevant to standing to pursue a claim of inadequate procedural protection. *Hotel and Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1503, 128 L.R.R.M. 2438 (U.S.D.C, 1988).

This is true even if the plaintiff is challenging procedures in the immigration process.

> We believe, however, that the plaintiffs have standing to sue. [Plaintiff], whose application to an INS district director for asylum has been denied, alleges that the INS' consultative procedures with the Department of State, and the agency's

refusal to grant EVD to Salvadorans, are illegal and cause him injury. Hernandez's allegation of concrete, redressable harm to his rights as an alien is sufficient to confer standing. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). In addition, the union is entitled to sue on its own behalf and as representative of its members. *Hotel Employees supra.*, at 1502.

The injured union members have standing to petition for the requested relief because their personal interest in correcting the alleged mishandling of ICE's detention is ongoing.

It is also true that the detainees may be identified at the current time by aliases. This is an inherent problem in matters involving alleged immigration administrative detention. That alone does not defeat the right of the detainee to seek relief.

The anonymity of union member asylum applicants does not undermine those members' standing to bring this claim. To satisfy itself that the requirements of "injury in fact" and causation have been met, the court need only know that some union members have sought asylum, have been denied, and *were probably subjected to the INS' defective procedures and thus detrimentally affected by them.* These facts alone ensure members' "personal stake in the outcome," *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) and guarantee that "the litigation will be pursued with the necessary vigor." *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955, 20 L.Ed.2d 947 (1968). These union members' personal interest exceeds "merely a generalized citizens' interest." *Andrade v. Lauer,* 729 F.2d 1475, 1494 (D.C.Cir.1984). *See also Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *Naming those members adds no essential information bearing on the injury component of standing.* Similarly, it is clear at this stage that the previously identified standing requirement of a definite statement of a controversy that is fit for judicial consideration has been satisfied. This element does not require identification by name of injured members or a

detailed account of how each union member's application was handled. [emphasis supplied] *Hotel Employees supra.*, at 1506.

Thus, the detainees are entitled to the relief requested.

B.   <u>United Food and Commercial Workers Union, Local 7 has standing.</u>

It has long been settled that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members. *E.g., National Motor Freight Assn. v. United States,* 372 U.S. 246 [83 S.Ct. 688, 9 L.Ed.2d 709] (1963)." *Warth supra at* 511.   While the "possibility of such representational standing … does not eliminate or attenuate the constitutional requirement of a case or controversy," *ibid.* See *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) under certain circumstances, injury to an organization's members will allow that organization to litigate in federal court on their behalf. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

> "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit…. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth supra at 511.*

This doctrine has been stated as a three-part test:

> "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The first requirement is satisfied if the association's members, " 'or any one of them, are suffering immediate or threatened injury as a result of the challenged action.' " *Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 312 (D.C.Cir.1985) *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).  In evaluating whether the challenged action threatens injury to members, this court must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth supra at* 501. "As a general matter, a plaintiff's standing to pursue a claim rests on the theory of injury presented in the complaint and the facts alleged in support of the claim."  At this stage, "the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant." *Haase v. Sessions,* 835 F.2d 902, 907 (D.C.Cir.1987).

The *Washington Apple* requirement that one or more members of the representative organization have standing to sue is satisfied by those members who hope for procedurally sound consideration of their asylum requests. *Hotel Employees supra.,* at 1503.

Having found that some members of the Union have standing to bring this action in their own right, the court needs only to consider whether the second of *Hunt*'s preconditions for associational standing has been satisfied here. There is little question that the interests that The Union seeks to protect in this suit are "germane to the organization's purpose," *Hunt, supra* at 343. Its purpose is to represent the members in the workplace and assist them in social as well as work matters. (See affidavit of Rodriquez, attached hereto as Exhibit 4) Thus the inquiry narrows to whether the interests the union seeks to protect are germane to the union's purpose. The representation of workers in situations similar to this is part of the *raison d'etre* of the United Food & Commercial Workers Union.  As stated in Article 2 of its International Constitution (Exhibit 5 attached hereto) at page 1, and Article III of the Bylaws of United Food & Commercial Workers Union, Local #7:

> The objective of this International Union shall be. . .to take all steps and actions, which are reasonable and proper, to promote the welfare and interests of its members, of workers within its jurisdiction, and of workers generally and to afford mutual protection to members against unwarranted rules, unlawful discharge, or other forms of injustice or oppression; . . .

(Exhibit 6, p. 2-3) Courts have articulated a "mo-dest but sensible" test for organizational germaneness under the second prong of *Washington Apple*. In *Humane Society of the United States v. Hodel,* 840 F.2d 45 (D.C.Cir.1988), the Court concluded "it is highly unlikely the second prong of germaneness was meant to set the narrow perimeter of centrality of purpose * * *.

Rather, it would seem to require only that an organization's litigation goals be pertinent to * * * the grounds that bring its membership together." *Id.,* p. 56.

The standard in *Humane Society* is more than satisfied here, since this litigation unquestionably aims to enhance the union's success in its central missions. The union's purposes include protecting its members. Understandably fearful and unwilling to come forward, undocumented non-citizens employed by companies in the meat packing industry do not identify themselves to the union. The union's current effort to protect its members' interest in proper due process and deportation procedures is, therefore, germane to the union's activities as an organization interested in enrolling and protecting workers. That interest is impaired by procedurally deficient actions such as the one in this case because the Union cannot even identify the individuals who are held incognito to ensure that they are receiving due process.

Clearly, the Union cannot perform its primary function, representation of the workplace, where, as here, the respondents' "practices have perceptibly impaired [the organizational plaintiff's] ability to provide [the services it was formed to provide] … there can be no question that the organization suffered injury in fact." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Catholic Social Services, Inc. v. Ashcroft,* 268 F.Supp.2d 1172, 1188(E.D.Cal.,2002).

In the present case, the union has set forth institutional goals of protecting a broad range of rights for workers. These purposes are reflected in the union's constitutions, and are sufficient to meet the requirements for associational standing. See *California Rural Legal Assistance, Inc. v. Legal Services Corp.*, 917 F.2d 1171, 1174 (C.A.9 1990). Thus, though the unique facts of each member's claim will have to be considered by the proper authorities before any member will be able to utilize the rights accorded him by law, the Union can litigate this case without the participation of those individual claimants and still ensure that "the remedy, if granted, will inure to the benefit of those members of the association actually injured," *Warth, supra,* at 515.

> Standing of an association as a representative of members requires that at least some of the members would have standing to sue in their own right, and also that the interests the association seeks to advance are germane to its purposes and that neither its claim nor the relief requested is such as to require participation in the suit by individual members. (cites omitted). Neither of the latter (association-specific) requirements is in question here, so the Federation has standing if some of its members would. *Federation for American Immigration Reform, Inc. v. Reno* 93 F.3d 897, 900 (C.A.D.C.,1996).

Thus, both the detainees and the Union have standing to pursue these claims.

*II.*

*Constitutional Violation Claims*

The Union has limited information about Petitioners' arrests.  However, even given the sparse information available, UFCW believes the following Constitutional and statutory violations have occurred.

A.    Violations of Fourth Amendment

UFCW has a good faith belief that the December 12, 2006 raid constituted an illegal search and seizure.

ICE may not stop and detain individuals based solely on a reasonable suspicion that they are aliens, without any reason to believe they are unlawfully in the country. *Illinois Migrant Council v. Pilliod*, 531 F. Supp. 1011, 1017 (N.D. Ill. 1982). "[A]n investigatory stop based on less than probable cause may only be performed if there is a reasonable suspicion, based on specific articulable facts concerning the individual in question, that the individual stopped is engaged in criminal activity." *Id.*  "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal behavior." *US v. Cortez*, 449 U.S. 411 (1981). Investigatory stops may only be performed when the totality of the circumstances raise a suspicion that the person stopped is engaged in criminal conduct.  *Id.*  Suspicion of one's alien status is not enough.

Ostensibly, ICE raided the Swift plant pursuant to a criminal investigation into identity theft. To date, it has produced no information articulating that each Petitioner, individually, may have been engaged in identity theft. By comparison, in Kentucky, ICE agents sought out the specific individuals suspected of identity theft during an encounter with a Swift plant there. In Colorado, ICE employed a wide dragnet to determine whether Petitioners participated in identity theft. It has set forth no information about how it concluded that each Petitioner individually was involved in identity theft.

Further, ICE set forth no information justifying occupying the plant and suspending operations.

The restriction of movement within the plant constituted a stop. As ICE failed to articulate a reasonable suspicion that Petitioners were involved in identity theft, the raid constituted pretextual stop. "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *US v. Guzman*, 864 F.2d 1512, 1515 (10th Cir. 1988) *overruled by US v. Botero-Ospina*, 71 F/3d 783 (10th Cir. 1995) (adopted new standard for reviewing the constitutionality of a traffic stop).

The sheer disparity between the number of employees arrested versus those charged with any crime related to identity theft is a vivid example of ICS's abuse of its police power.

"[P]retextual use of police power raises a problem of constitutional magnitude." *Guzman*, 864 F.2d at 1516. *See Steagald v. US*, 451 US 204 (1981) (arrest warrant cannot justify entry into third party's home due to possibility that warrant may be used as pretext to search); *Abel v. US*, 362 US 217 (1960) (use of administrative warrant to search for evidence of criminal activity would be illegitimate); *US v. Lefkowitz*, 285 US 452 (1932) ("An arrest may not be used as a prextext to search for evidence.").

Similarly, the phantom reasonable articulable suspicion of identity theft underlying the raid constituted an illegal arrest. *INS. v. Delgado*, 466 US 210 (1984) ("The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."  *Id.* at 215. "Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* An initially consensual encounter between a law enforcement officer and a citizen can be transformed into a seizure or detention "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.*

Finally, "The Sec. 1304(e) arrest power does not permit 'rounding up the suspects' simply in order to investigate aliens' immigration status." *Mountain High Knitting v. Reno*, 51 F.3d 216, 219 (9th Cir. 1995).

Essentially, ICE's raid was a rounding up of persons suspected of being in this country illegally. Its alleged investigation of identity theft was a pretext to accomplish this task.

B.   Violation of the Fifth Amendment

The Due Process Clause of the Fifth Amendment assures the humane treatment of noncitizens in detention. *Lynch v. Cannatella*, 810 F. 2d 1363, 1373 – 74 (5th Cir. 1987). Courts have held that deportable noncitizens enjoy a range of due process rights including the following: the right to be represented by counsel, *Orantes-Hernandez v. Thornburgh*, 919 F.2d 548, 554 (9th Cir. 1990); the right to access free legal services lists, *Perez-Fuenz v. INS*, 619 F.Supp. 656, 666–668 (C.D. Cal. 1985); the right to medically adequate treatment, *Haitian Centers Council v. Sale*, 823 F. Supp. 1028, 1043 (E.D.  NY 1993); the right to access telephones, *Perez-Fuenz* 619 F. Supp. at 664; and the right to self-help and other legal reference materials, *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1511 (C.D. Cal. 1988).

Since December 12, 2006, Petitioners have been held in custody without being charged with a crime and without bail or bond, or removed to outside of the United States.  None of the Petitioners have been presented in

a court of law or before an administrative body authorized to determine their immigration status.

None of the Petitioners have been given a hearing to determine whether they are deportable. Detained non-citizens have the right to a hearing to determine their immigration status. 8 U.S.C. § 1228

Detainees are or were approached by ICE agents who probably advised Petitioners to waive their rights and sign a stipulated removal order. A stipulated order of removal, when signed by an immigration judge, is a final order of removal (deportation) that results in the deportation of the non-citizen. 8 U.S.C. § 1229a(d). Through a stipulated removal order, a non-citizen admits all factual allegations relating to his removability, concedes deportability, waives application for any relief from removal, and waives appeal of the removal order. 8 C.F.R. § 1003.25(b).

To be conclusive, an immigration judge must sign a stipulated order of removal. 9 U.S.C. § 1229a(d); 8 C.F.R. § 1003.25(b). Federal regulations mandate that in the case of an unrepresented non-citizen, an immigration judge must determine whether the waiver signed by the non-citizen was voluntary, knowing and intelligent. 8 C.F.R. § 1003.25(b).

Petitioners do not believe this judicial determination was made with regard to the detainees in this case. A determination that the non-citizen's waiver of rights was voluntary, knowing and intelligent is necessary to ensure that the non-citizen understands the waivers of his or her right to

counsel, to a hearing to challenge her deportability, to pursue any relief such as asylum or voluntary departure, and to appeal the removal order. In the case of any removal order signed by an immigration judge, the INA requires the immigration judge to give notice to the non-citizen of his right to appeal the removal order. 8 U.S.C. § 1229a(c)(4).

Thus, to ensure that unrepresented non-citizens have validly waived their rights, federal law mandates that immigration judges determine that such waivers are voluntary, knowing and intelligent. In failing to conduct a hearing or some other inquiry into the voluntariness of the waivers made by Petitioners, ICE violated federal law and Petitioners' due process rights.

In addition to deprivation of liberty, Petitioners may have been deprived use of personal and real property. Some Petitioners' automobiles remain, and have remained, in the Swift plant parking lot since December 12, 2006. Likewise, Petitioners who are home owners suffer a similar deprivation.

In addition to violating Petitioners' due process rights, all removals to outside the United States violate this Court's Order that Petitioners remain in the jurisdiction until ordered otherwise.

Finally, it is important to determine whether certain of the Petitioners have the requisite evidence to show they reside and work within the United States lawfully. In any event, the continued deprivation of Petitioners' liberty has led to the separation of them from their families and communities. Their

continued absence from Swift threatens their employment status there. Loss of job may cause economic trauma.

*III.*

*Need for Discovery*

Some discovery is permissible in this procedure. 28 U.S.C. § 2246. The circumstances underlying this Petition require discovery due to limited information regarding the arrest and detention of Petitioners. The nature and content of ICE agents' interaction with Petitioners must be revealed, particularly in cases where there were expedited removals.  It would be helpful to know if Petitioners were afforded access to prompt and effective legal consultation before any rights were waived.  Certain Petitioners may not have had an opportunity to provide documentation to support their continued residence or citizenship in the United States. There is an endless string of conjecture and speculation in absence of Petitioners' voices and presence outside of detention.

*IV.*

*Conclusion*

The December 12, 2006 raid on Swift's meat plant in Greeley, as well as across the nation, constituted an outrageous abuse of police power. A criminal investigation into identity theft functioned as the Trojan Horse to effectuate an immigration raid. Mass denial of the right to be advised by counsel regarding their rights was a deliberate attempt to coerce expedited

removals for a group of persons, Petitioners, who have not been charged with crimes and possess no criminal convictions. It seems to be in furtherance of Chertoff's stated change in policy to "catch and return" non-citizens.

Not only was the raid itself an outrageous abuse of police power but the withholding of vital information, such as the location of the detainees, is a deliberate circumvention of Petitioners' due process rights.

Expedited removal is forcible, and provides the ICE agents the discretion to remove any alien for any reason other than possessing a credible fear of returning to his or her country. Thus, voluntary return is essentially a legal fiction and a non-citizen has no real ability to choose voluntary return in lieu of removal proceedings.  The ICE agents decided whether certain of the Petitioners were to be returned, apparently with the hope that such a decision is unreviewable, even if it does not comply with the regulations.

Essentially, ICE "disappeared" hardworking individuals without providing an opportunity to challenge their detention and/or removal. It is these kinds of disappearances that the Great Writ was designed to protect against.

For the reasons set forth above, Petitioners and the Union submit the Writ of Habeas Corpus should be granted and relief deemed appropriate by the Court ordered.

Respectfully submitted on this 18th day of December, 2006.

Counsel for Petitioners
and Petitioners' Next Friend


s/ John Bowen

John P. Bowen
DeAngelo Starnes
7760 W. 38th Ave., Suite 400
Wheat Ridge, CO, 80033
(303)425-0897 ext. 445


Address of Petitioners' Next Friend

United Food & Commercial Workers Union Local No. 7
7760 W. 38th Ave., Suite 400
Wheat Ridge, Colorado, 80033
303)425-0897 ext. 445

## Certificate of Service

I certify that on this 18th day of December 2006, a true and correct copy of the foregoing BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS was forwarded to the following by ECF or certified mail, return receipt requested:

United States Attorney
District of Colorado
**DELIVERED VIA ECF**

Julie L. Meyers, - CERTIFIED MAIL
Assistant Secretary for
Homeland Security for Immigration and Customs Enforcement
425 Eye Street, NW Room 7100
Washington, D.C., 20536

Douglas Maurer, Director - CERTIFIED MAIL
ICE Field Office
4730 Paris Street
Denver, CO 80239

United States Attorney General - CERTIFIED MAIL
Room 5111, Main Justice Bldg.
10th & Constitution, N.W.
Washington, DC 20530


/s Carol Glasmann
Legal Secretary